## FEDERAL ELECTION COMMISSION
v.
## MACHINISTS NON–PARTISAN POLITICAL LEAGUE, Appellant.

### No. 80–1136.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1981.

Decided May 19, 1981.

Certiorari Denied Oct. 13, 1981. See 102 S.Ct. 397.

**382**

Joseph L. Rauh, Jr., Washington, D. C., with whom John Silard and Judy Lyons

Wolf, Washington, D. C., were on the brief, for appellant.

Miriam Aguiar, Atty., Federal Election Commission, Washington, D. C., with whom Charles N. Steele, Gen. Counsel and Kathleen I. Perkins, Asst. Gen. Counsel, Federal Election Commission, Washington, D. C., were on the brief for appellee.

Lawrence M. Noble and Marsha G. Gentner, Attys., Federal Election Commission, Washington, D. C., also entered appearances for respondent.

Before TAMM and WALD, Circuit Judges and HAROLD H. GREENE *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Machinists Non-Partisan Political League ("MNPL") appeals from a district court order which enforced a subpoena issued to MNPL by the Federal Election Commission ("FEC" or "Commission"). The subpoena was part of an FEC investigation into the activities of nine so-called "draft-Kennedy" organizations which operated during the first ten months of 1979. We hold that FEC's subpoena exceeded the Commission's subject matter jurisdiction, and therefore vacate the enforcement order.

## I. FACTS AND PROCEEDINGS BELOW

MNPL is the political arm of the International Association of Machinists ("IAM"), and is registered as a "multi-candidate political committee" under the Federal Election Campaign Act, 2 U.S.C. § 431 et seq. ("FECA").[1] MNPL and the IAM had supported the election of Jimmy Carter in 1976, but thereafter became disenchanted with

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. All references to FECA in this opinion—unless otherwise indicated—are to the provisions

operative prior to the Federal Election Campaign Act Amendments of 1979, Pub.L. No. 96–187, 93 Stat. 1339 (January 8, 1980).

various of his policies deemed antithetical to the interests of the IAM membership.[2] By February, 1979 MNPL had begun encouraging and assisting the formation of "draft-Kennedy" groups in several states—including Iowa, Illinois and Florida—all engaged in promoting the acceptance of presidential candidacy by Senator Edward Kennedy. Between May, 1979 and November 7, 1979 when Senator Kennedy formally announced his candidacy for President, MNPL gave, by its own admission, approximately $30,000 to "draft-Kennedy" groups in seven states. Brief for MNPL at 7–8.[3]

On October 4, 1979 the FEC received a complaint from the Carter-Mondale Presidential Committee, Inc., alleging that nine "draft-Kennedy" organizations were in violation of certain provisions of FECA. Specifically, the complaint alleged (1) that the "draft-Kennedy" groups were "political committee[s]" as that term is defined by FECA, 2 U.S.C. § 431(d); (2) that the nine named draft committees were affiliated within the meaning of 2 U.S.C. § 441a(a)(5), 11 C.F.R. § 110.3(a)(1)(ii)(D), and therefore all were subject to a single $5,000 contribution limitation, 2 U.S.C. § 441a(a)(1)(C), (a)(2)(C); and (3) that MNPL had exceeded this contribution limitation, thereby violating 2 U.S.C. § 441a(a)(2)(C). The complaint *expressly* declined to take any position on whether Senator Kennedy had become a "candidate" for purposes of the Act, Complaint at 11, and acknowledged that Kenne-

dy had formally disavowed the various "draft-Kennedy" organizations, *id.* at 27.

Based on this complaint, FEC notified MNPL on October 19, 1979, that it had "found reason to believe" that

by contributing, in the aggregate, in excess of $5,000 in a calendar year to the Florida for Kennedy Committee, New Hampshire Democrats for Change, Committee for Alternatives to Democratic Presidential Candidate, and Illinois Citizens for Kennedy, MNPL may have violated 2 U.S.C. § 441a(a)(2)(C). The Commission has determined that these four committees, among others, may be affiliated within the meaning of the Act and the Commission's regulations and that, if affiliated, contributions to them must be aggregated for purposes of the limitations set forth in 2 U.S.C. § 441a(a)(2)(C).

Letter from William C. Oldaker, General Counsel, FEC, to Howard F. Dow, Secretary-Treasurer, MNPL (October 19, 1979).

On November 2, 1979, the Carter-Mondale Presidential Committee submitted an amendment to its complaint asking that

Senator Kennedy be found to be a candidate under 2 U.S.C. § 431(b)(2) as of no later than September 1, 1979; ... and that all contributions made by ... multicandidate political committees in excess of $5,000—to the Florida, New Hampshire and any other affiliated draft-Kennedy committees on or after September 1, 1979, be found in violation of the limitations of 2 U.S.C. § 441a(a) ....

---

**2.** On September 8, 1978, IAM President Winpisinger delivered a major address in which he declared:

President Carter has abandoned his constituency, his party's platform, and his own campaign pledges. Carter may be the best Republican President since Herbert Hoover. Look at his record.

  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

President Carter—to me—is through. He is a weak, vascillating and ineffective President. I know as well as anyone, that those are dangerous words.
MNPL Brief at 6–7.

**3.** The court is aware that the complaints and the Oldaker "reason to believe" notice discussed in the text, immediately *infra*, may qualify for protection from disclosure under 2 U.S.C. § 437g(a)(12), and under the Commis-

sion's regulations, 11 C.F.R. § 111.21 (1980). We need not decide in this case whether these provisions properly apply to disclosure by the courts, since neither party has raised this issue. On the contrary, both MNPL and the FEC have constructively waived any legal interest they may have in the confidentiality of these documents by discussing them in detail in their publicly available briefs to this court. *See* MNPL Brief at 17–8; FEC Brief at 3–5. Furthermore, nothing in our discussion reveals any facts beyond those the parties themselves have discussed in public, and we deem it essential in this case to outline the contents of the complaint, and the Commission's basis for its investigation (the "reason to believe" notice), in order that our holding on the limits of FEC's jurisdiction may be properly understood.

Amended Complaint at 3. Significantly, both the original complaint and the amended complaint focused exclusively on the nine respondents' "draft-Kennedy" activities, not on any other political, candidate-support activities in which they may have engaged.[4]

On November 5, 1979, the Commission issued a sweeping subpoena to MNPL, ordering production of, inter alia, all documents and materials relating to communications between MNPL and other "draft-Kennedy" groups. The Commission's subpoena further demanded

> All documents and materials (including but not limited to minutes, notes, memoranda, or records of telephone conversations) relating to meetings, discussions, correspondence, or other internal communications whereby the MNPL or any of its committees or sub-units determined to support or oppose any individual in any way for nomination or election to the office of President in 1980.

Joint Appendix (hereinafter "J.A.") at 4–7. MNPL was also ordered to provide a list of every official, employee, staff member, and volunteer of the organization, along with their respective telephone numbers. The Commission made no attempt to limit its subpoena to the period after September 1, during which the amended complaint alleged that Senator Kennedy was a candidate for President, or to material relevant to the alleged support of Senator Kennedy's candidacy. In fact the subpoena nowhere even refers to Senator Kennedy or his alleged candidacy, except in listing the official names of the "draft-Kennedy" groups.

Following denial by the Commission of MNPL's motion to quash the subpoena for lack of jurisdiction, the FEC filed a petition in district court to enforce its subpoena. At a hearing on the Commission's petition on January 28, 1980, the parties fully argued the issue of the Commission's subject matter jurisdiction over draft committees. In ordering MNPL to comply with the Commission's subpoena, see J.A. at 13–17, the court held that a subpoena enforcement proceeding is not the proper forum for deciding the issue of the Commission's alleged lack of jurisdiction. Although the court twice emphasized that it was not deciding the "merits" of MNPL's jurisdictional argument, the court did specifically find that the "guidelines of enforceability" found in United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), were satisfied.

> [T]he requirements to be met are first that the inquiry must be made within the authority of the agency. I don't think there is any question but what this inquiry is within the authority of the Federal Elections [sic] Commission. It was just this type of matter that caused Congress to set the whole machinery in motion when it enacted the statute.

J.A. at 13–14.

■ The district court's order enforcing the Commission's subpoena raises two issues.[5] First, we must decide if, before enforcing this particular subpoena, the district court first should have determined whether subject matter jurisdiction existed for the Commission's investigation. We answer that question affirmatively. Accordingly, we must also examine the district court's finding that the investigation of these draft committees was without "any question . . . within the authority of the Federal Elections [sic] Commission." J.A. at 13. We find, contrary to the district court, that the Commission lacks subject matter jurisdic-

---

4. In fact throughout this litigation the Commission has insisted that its interest lies only with the "draft-Kennedy" aspects of the named groups' activities, and not with any of their other political, candidate-support activities. See Trial Transcript at 7–8 (statement by FEC counsel that the subpoena "does not involve any of the other activities in the Machinists Non-Partisan Political League, which is a multi-candidate political committee, and it does not go to any activities in the Machinists Non-Partisan League that does not deal with the so-called draft-Kennedy movement").

5. Although counsel informs us at oral argument that depositions have been taken and documents submitted pursuant to FEC's subpoena, no question of mootness exists because the Commission's investigation into these draft groups still continues.

tion over the draft group activities it sought to investigate through this subpoena.

## II. STANDARDS FOR JUDICIAL ENFORCEMENT OF THIS FEC SUBPOENA

FECA declares that federal courts "may, . . . in case of refusal to obey a subpoena or order of the Commission . . ., issue an order requiring compliance[.]" 2 U.S.C. § 437d(b). This grant of permissive authority is similar to other statutes which also provide that courts "may" enforce administrative subpoenas.[6] Where the concerns of the subpoena-issuing agency are of a corporate or commercial character, the Supreme Court has made it abundantly clear that courts should deny enforcement only where there is "too much indefiniteness or breadth" in the items requested, or where the inquiry is not one which the requesting agency is lawfully authorized to make. *See Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208–09, 66 S.Ct. 494, 505–506, 90 L.Ed. 614 (1946). As the Court has pointed out,

[w]hile they may and should have protection from unlawful demands made in the name of public investigation, corporations can claim no equality with individuals in the enjoyment of a right to privacy. They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation. Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. *But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.*

*United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368–369, 94 L.Ed. 401 (1950) (citations omitted) (emphasis supplied).

The *Morton Salt* rule has been applied by this court repeatedly in business contexts to limit the scope of issues which may be litigated in a subpoena enforcement proceeding. In so doing we have repeatedly shown our awareness that the " 'very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate . . . .' " *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir.) (*en banc*), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977) (*quoting FMC v. Port of Seattle*, 521 F.2d 431, 433 (9th Cir. 1975)). Usually, scrutiny under the *Morton Salt* standard results in routine subpoena enforcement when the information sought falls within the purview of the regulatory agency's authority. *See, e. g., FTC v. Carter*, 636 F.2d 781, 785–87 (D.C. Cir.1980) (applying *Morton Salt* standard, and "conclud[ing] that the Commission has sufficient statutory authority to conduct the investigation it has ordered and that the investigation is related to congressionally prescribed duties of the Commission"); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 974 (D.C.Cir.1980); *FTC v. Anderson*, 631 F.2d 741, 745 (D.C.Cir.1979); *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1023–24, 1032–33 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979); *Appeal of FTC Line of Business Report Litigation*, 595 F.2d 685, 702–03 (D.C.Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978) (all cases where *Morton Salt* rule was applied in cor-

---

**6.** *See, e. g.*, 15 U.S.C. § 49 (FTC); 29 U.S.C. § 209 (Administrator, Fair Labor Standards Act).

porate or commercial contexts). *See also CAB v. Deutsche Lufthansa Aktiengesellschaft,* 591 F.2d 951, 952 (D.C.Cir.1979) ("In general, this court respects the doctrine that an agency has jurisdiction to determine the scope of its authority, in the first instance, and that such matters will not be determined in a proceeding to enforce a subpoena. This doctrine is subject to exceptions, as where there is a patent lack of jurisdiction, but we do not find those exceptions to be applicable to the instant case." (citations omitted)).

Even in business regulation cases, however, the Supreme Court has never sought to eviscerate the independent role which the federal courts play in subpoena enforcement proceedings. In *Oklahoma Press, supra,* for example, the Court sustained judicial enforcement of an administrator's subpoenas issued to various news publishing corporations for the purpose of investigating alleged violations of the Fair Labor Standards Act ("FLSA"). Although the Court held it was unnecessary for the administrator to prove that the newspapers were "covered" by the Act before securing enforcement of a subpoena to conduct his investigation, 327 U.S. at 216, 66 S.Ct. at 509, the Court went out of its way to emphasize that

> There is no harassment when the subpoena is issued and enforced according to law. The Administrator is authorized to enter and inspect, but the Act makes his right to do so subject in all cases to judicial supervision. Persons from whom he seeks relevant information are not required to submit to his demand, if in any respect it is unreasonable *or overreaches the authority Congress has given.* To it they may make "appropriate defence" surrounded by every safeguard of judicial restraint.

*Id.* at 217, 66 S.Ct. at 510 (emphasis supplied). The Court pointed out various "important questions which the Administrator's position concedes the courts may decide," and stressed the lower courts' duty to examine these questions with care. "The issues of authority to conduct the investigation, relevancy of the materials sought, and breadth of the demand," the Court declared, "are neither minor nor ministerial matters." *Id.* at 216–17 & n.57, 66 S.Ct. at 509 & n.57. The Court also found significant "the discretionary power implied in the [FLSA] statute's use of the word 'may,' rather than 'shall,' . . . in authorizing the court to enforce the subpoenas." *Id.* at n.57, 66 S.Ct. at 509–510 n.57; *compare* 2 U.S.C. § 437d(b) (FEC statute also uses the word "may," rather than "shall").

Other business regulation cases have recognized the duty of an enforcing court to assure itself that the subject matter of the investigation is within the statutory jurisdiction of the subpoena-issuing agency. *See, e. g., United States v. Morton Salt Co., supra,* 338 U.S. at 652, 70 S.Ct. at 368; *FTC v. Carter, supra,* 636 F.2d at 785–87; *FTC v. Owen-Corning Fiberglas Corp., supra,* 626 F.2d at 974; *Appeal of FTC Line of Business Report Litigation, supra,* 595 F.2d at 702–03; *FTC v. Texaco, Inc., supra,* 555 F.2d at 872. The FEC does not, and could not, claim any exemption from similar judicial scrutiny of its subpoenas.

■ The subpoena in this case, however, possesses a number of characteristics which make it especially important for an enforcing court to exercise particular care in assuring itself that subject matter jurisdiction does exist.

First, this investigation into "draft-Kennedy" groups represents an unprecedented assertion of subject matter jurisdiction[7] for the FEC. The Commission has failed to

---

7. This case concerns the jurisdiction of the FEC over the subject matter of contribution limitations to "draft" groups. It does not concern whether these groups—some of whom have registered with the FEC as multi-candidate political committees—are subject to the Commission's jurisdiction for other purposes. Obviously the mere fact of registration cannot suf

fice as a jurisdictional basis for an FEC investigation into any or all activities of a registrant, any more than registration before the SEC can suffice as a legal basis for an SEC investigation into any or all of a corporate registrant's activities, *e. g.,* its equal employment or labor relations practices. *Cf.* FEC Brief at 21.

show us a single prior instance where it sought to conduct an investigation based solely upon alleged jurisdiction over "draft candidate" groups. Only two courts have ever considered FEC requests to enforce subpoenas on this basis, and in both cases the respondents were "draft-Kennedy" groups named in the very same Carter-Mondale complaints which form the basis for this investigation. *FEC v. Wisconsin Democrats for Change in 1980*, Order No. 80–C–124 (W.D.Wis. Apr. 24, 1980); *FEC v. Florida for Kennedy Committee*, 492 F.Supp. 587 (S.D.Fla.1980).[8]

■ This novel extension of the Commission's investigative authority warrants extra-careful scrutiny from the court because the activities which the FEC normally investigates differ in terms of their constitutional significance from those which are of concern to other federal administrative agencies whose authority relates to the regulation of corporate, commercial, or labor activities. The FEC does not oversee fair dealings in commerce, or insure adequate corporate disclosures, or guarantee fair labor standards, all of which are areas where only the minimal limitations upon the commerce power are usually implicated.[9] The subject matter which the FEC oversees, in contrast, relates to the behavior of individuals and groups *only insofar as they act, speak and associate for political purposes.* *See* 2 U.S.C. §§ 431, 441a. The creation of

such an agency raised weighty constitutional objections, and its authority to exercise control over an area where "uninhibited, robust, and wide open"[10] activity is constitutionally protected was approved by the Supreme Court only after being meticulously scrutinized and substantially restricted. *See Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus the highly deferential attitude which courts usually apply to business related subpoena enforcement requests from agencies whose subject matter jurisdiction is unquestioned, has no place where political activity and association never before subject to bureaucratic scrutiny form the subject matter being investigated.

■ A second consideration making careful judicial scrutiny of jurisdiction necessary in this case is the obvious difference between the scope of investigatory authority vested in agencies such as the FTC,[11] SEC,[12] or the Administrator of the Department of Labor's Wage and Hour Division[13] on the one hand, and the FEC on the other. The former agencies are vested with broad duties to gather and compile information and to conduct periodic investigations concerning business practices. But the FEC has no such roving statutory functions. On the contrary, investigations such as the one conducted here may begin only if an individual first files a signed, sworn, notarized

8. In *Wisconsin Democrats*, the court recognized and addressed the issue of subject matter jurisdiction, and found on the merits that "on its face, the subject matter of the subpoena . . . is within the authority of the agency, thus meeting the . . . *Morton Salt* test." Order at 4–5. On the other hand, in *Florida for Kennedy Committee*, the district court found that "[t]he authorities appear generally to support [the] proposition" that "a political committee can only be a group whose major purpose is the nomination or election of a candidate," but held that under *Oklahoma Press* it could not consider the issue of "coverage" at the subpoena enforcement stage. 492 F.Supp. at 595–96 & n.12.

9. *See generally North American Co. v. SEC*, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1949); *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *Electric Bond Co. v.*

*SEC*, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936 (1938); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Northern Securities Co. v. United States*, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904); *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 193–95, 6 L.Ed. 23 (1824).

10. *Cf. New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

11. 15 U.S.C. § 46.

12. 15 U.S.C. § 78u.

13. 29 U.S.C. § 211.

complaint with the Commission.[14] The Commission's duty thereafter is "expeditiously" to conduct a confidential investigation of the complaint. 2 U.S.C. § 437g(a)(3). Plainly, mere "official curiosity" will not suffice as the basis for FEC investigations,[15] as it might in others. *Cf. United States v. Morton Salt Co., supra,* 338 U.S. at 652, 70 S.Ct. at 368 (FTC subpoena enforcement proceeding).

█ The third, and most important reason for heightened judicial concern over the absence of jurisdiction is the delicate nature of the materials demanded in this broad subpoena. As already described, the subject matter of these materials represents the very heart of the organism which the first amendment was intended to nurture and protect: political expression and association concerning federal elections and officeholding. The FEC first demands *all* available materials which concern a certain political group's "internal communications," wherein its decisions "to support or oppose any individual in any way for nomination or election to the office of President in 1980"

are revealed. J.A. at 4–7. Then this federal agency, whose members are nominated by the President, demands *all* materials concerning communications among various groups whose alleged purpose was to defeat the President by encouraging a popular figure from within his party to run against him. As a final measure, the FEC demands a listing of every official, employee, staff member and volunteer of the group, along with their respective telephone numbers, without any limitation on when or to what extent those listed participated in any MNPL activities. The government thus becomes privy to knowledge concerning which of its citizens is a "volunteer" for a group trying to defeat the President at the polls. This information is of a fundamentally different constitutional character from the commercial or financial data which forms the bread and butter of SEC or FTC investigations,[16] since release of such information to the government carries with it a real potential for chilling the free exercise of political speech and association guarded by the first amendment.[17]

**14.** Any person who believes a violation of this Act or of chapter 95 or chapter 96 of title 26 has occurred may file a complaint with the Commission. Such complaint shall be in writing, shall be signed and sworn to by the person filing such complaint, and shall be notarized.... The Commission may not conduct any investigation under this section, or take any other action under this section, solely on the basis of a complaint of a person whose identity is not disclosed to the Commission.
2 U.S.C. § 437g(a)(1).

**15.** It is noteworthy in this regard that the 1979 Amendments to FECA abolished the "random" auditing authority which the FEC previously possessed under 2 U.S.C. § 438(a)(8). *See* 2 U.S.C. § 438(b) (Supp. III 1980); Pub.L. No. 96–187, § 109 (1980); 125 *Cong.Rec.* H12366 (daily ed. Dec. 20, 1979) (remarks of Rep. Thompson). *But see* 2 U.S.C. § 437g(a)(2) (Supp. III 1980) (FEC may make "reason to believe" finding on basis of "information ascertained in the normal course of carrying out its supervisory responsibilities").

**16.** *Cf. SEC v. McGoff,* 647 F.2d 185 at 190–191 (D.C.Cir.1981) (in enforcing an SEC subpoena to a newspaper publisher and writer, "an accommodation was required to avoid unnecessary encroachment upon [the publisher's] activities and associations ...").

**17.** One can only imagine what the Founding Fathers would have thought of a federal bureaucracy demanding comprehensive reports on the internal workings and membership lists of peaceful political groups. It bears remembering that Elbridge Gerry, Oliver Ellsworth, Roger Sherman, Spencer Roane, Noah Webster, James Iredell, and others all sought anonymity while they conducted the most important political campaign of *their* lives, the campaign to ratify the federal constitution. *See Pamphlets on the Constitution of the United States* (P. Ford, ed., DeCapo Press reprint 1968); *Essays on the Constitution of the United States* (P. Ford, ed., reprint 1970). In fact, the *Federalist Papers*—"the most important work in political science that has ever been written, or is likely ever to be written, in the United States"—was published anonymously by its authors, Hamilton, Madison, and Jay. *The Federalist Papers* at vii (Mentor ed. 1961) (intro. by Clinton Rossiter).

Fear and resentment of royal, administrative control over politics generally, and elections particularly, was a key element in the opposition political culture of England during the eighteenth century, a culture which permeated political thinking in the American colonies. *See* B. Bailyn, *The Origins of American Politics* 30, 52–3, 56–7 (1968). Indeed free popular elections represented one of the foundations of

■ Current first amendment jurisprudence makes clear that before a state or federal body can compel disclosure of information which would trespass upon first amendment freedoms, a "subordinating interest of the State" must be proffered, and it must be "compelling." *NAACP v. Alabama,* 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958) (*quoting Sweezy v. New Hampshire,* 354 U.S. 234, 265, 77 S.Ct. 1203, 1219, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)).[18] The Supreme Court has warned that

> It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas ....

*Sweezy v. New Hampshire, supra,* 354 U.S. at 245, 77 S.Ct. at 1209.

■ In particular, the FEC's demand for a list of all members and volunteers of this political group implicates the rigorously protected first amendment interest in privacy of political association.

> It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective ... restraint on free-

dom of association .... This Court has recognized the vital relationship between freedom to associate and privacy in one's associations.... Inviolability of privacy in group association may in many circumstances be indispensible to preservation of freedom of association ....

*NAACP v. Alabama, supra,* 357 U.S. at 462, 78 S.Ct. at 1171–1172. *See also Bates v. Little Rock, supra,* 361 U.S. at 523, 80 S.Ct. at 416.

We do not here demand of the FEC that it show a compelling interest before it may obtain the information it seeks. Instead, we may assume *arguendo* that if the FEC has statutory jurisdiction to conduct this investigation, then a compelling interest for the subpoenaed information can be shown. But if, on the other hand, the FEC lacks jurisdiction to enforce contribution limitations on "draft" groups, then no compelling interest for the subpoenaed information can possibly exist. The highly sensitive character of the information sought simply makes it all the more important that the court be convinced that jurisdiction exists to conduct this investigation before it enforces subpoenas issued pursuant thereto.

■ A final factor which causes us to carefully examine jurisdiction at this stage is that the Commission's assertion of juris-

---

republican government for Jefferson and his colleagues: "Action by the citizens in person in affairs within their reach and competence, and in all others by representatives, chosen immediately, and removable by themselves, constitutes the essence of a republic[.]" 10 *The Writings of Thomas Jefferson* 24 (P. Ford, ed. 1899) (letter from Jefferson to DuPont de Nemours). If popular elections formed the essence of republican government, free discourse and political activity formed the prerequisite for popular elections. As Madison wrote, a government which is "elective, limited and responsible" to the people requires "a greater freedom of animadversion" than one not so structured. Madison's Report on the Virginia Resolutions of December 21, 1798, *in* 4 *Elliot's Debates* 546, 570, 574–75 (1836).

In our day, the Supreme Court has recognized that "debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). Because

the electoral process plays so central a role in our conception of a free government, "it can hardly be doubted that the constitutional guarantee [of the first amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). We therefore would be remiss if we failed to give the most careful scrutiny to this unprecedented FEC investigation.

18. *See Bates v. Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); *Common Cause v. Schmitt,* 512 F.Supp. 489 (D.D.C. 1980) (three-judge court), *probable jurisdiction noted,* 450 U.S. 908, 101 S.Ct. 1344, 67 L.Ed.2d 331 (1981) ("Following *Buckley,* then, it is plain that election laws regulating political expression require a demonstration of 'compelling governmental interest' to withstand a constitutional challenge calling for 'strict scrutiny' by a reviewing court").

diction here rests solely upon a legal interpretation of the statute which does not depend upon any facts sought to be gleaned through the subpoena.[19] The Commission has already determined that Senator Kennedy was *not* a candidate for President as of August 17, 1979, but it nevertheless asserts that "draft-Kennedy" activities both before and after that date are controlled by FECA's reporting and contribution provisions. FEC Advisory Opinion 1979–40 (Aug. 17, 1979). *See also* FEC Advisory Opinion 1979–49 (Oct. 5, 1979). No matter what facts it finds through this investigation, the requisite jurisdiction for the investigation itself must stand or fall on the purely legal claim that "draft" groups are "political committees" under FECA. The Commission does seek additional facts regarding the affiliation question,[20] but this will not alter the Commission's legal assertion concerning jurisdiction over draft groups.

■ After reviewing these particular characteristics of the FEC subpoena, we conclude that where the Commission seeks judicial enforcement of a sweeping subpoena, issued pursuant to an unprecedented investigation which intrudes upon centrally important first amendment associational and advocacy interests, and where the FEC's assertion of jurisdiction to conduct the investigation rests solely upon a legal interpretation of a statute without any need for additional facts, then it is essential for a court to assure, itself affirmatively that the investigation is within the subject matter jurisdiction of the Commission before lending its authority to enforcement of a subpoena.

## III. FEC JURISDICTION OVER "DRAFT CANDIDATE" GROUPS

The sole proffered jurisdictional basis for this FEC subpoena is a complaint alleging that MNPL's contributions to various "draft-Kennedy" groups in excess of $5,000 violated the contribution limitations of FECA. *See* pp. 383–384 *supra*. The Act provides that "[n]o multicandidate political committee shall make contributions— . . . to any other political committee in any calendar year which, in the aggregate, exceed $5,000." 2 U.S.C. § 441a(a)(2).[21] MNPL argues that none of the groups to which it gave contributions were "political committee[s]" for purposes of this contribution limitation, and that therefore the FEC lacks subject matter jurisdiction to conduct its investigation. The FEC, taking the opposite view, asserts that the "draft-Kennedy" groups are "political committee[s]." The Act defines the operative terms as follows:

> "political committee" means any committee, club, association, or other group of persons which receives contributions or makes expenditures during a calendar year in the aggregate amount exceeding $1,000;

---

**19.** In the Seventh Circuit, it is well-settled that the *Oklahoma Press* rule restricting litigation of jurisdictional issues in subpoena enforcement proceedings will be relaxed where "the issue involved is a strictly legal one not involving the agency's expertise or any factual determinations." *FTC v. Miller,* 549 F.2d 452, 460 (7th Cir. 1977); *see FTC v. Feldman,* 532 F.2d 1092, 1096 (7th Cir. 1976); *Jewel Cos. v. FTC,* 432 F.2d 1155, 1159–60 (7th Cir. 1970). *Cf. FTC v. Ernstthal,* 607 F.2d 488, 491 & n.5 (D.C.Cir. 1979) (applying the *Miller* rule *arguendo,* but reserving the question whether this Circuit has formally adopted it). *See generally* text at note 32 *infra.*

**20.** Apparently, the Commission issued its subpoena for the purpose of obtaining information concerning alleged affiliations among the "draft" groups. "We are not asking for all the documents in connection with all of MNPL's political activities. We are simply requesting documents to either substantiate or refute the alleged affiliation question [sic]." FEC Counsel at Oral Argument.

**21.** The statute also provides:

> No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions *of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate,* or knowingly make any *expenditure on behalf of a candidate,* in violation of any limitation imposed on contributions and expenditures under this section.

2 U.S.C. § 441a(f) (emphasis supplied).

"contribution"—

(1) means a gift, subscription, loan, advance, or deposit of money or anything of value made for the purpose of—

(A) influencing the nomination for election, or election, of any person to Federal office or for the purpose of influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party, or

(B) influencing the results of an election held for the expression of a preference for the nomination of persons for election to the office of President of the United States;

.    .    .    .    .

"expenditure"—

(1) means a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of—

(A) influencing the nomination for election, or the election, of any person to Federal office, or to the office of presidential and vice-presidential elector; or

(B) influencing the results of a primary election held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the nomination of persons for election to the office of President of the United States[.]

2 U.S.C. § 431(d), (e), (f).

On its face, the statute might seem to include as political committees not only "draft candidate" groups like the ones in this case, but also issue-oriented groups, lobbying organizations, religious bodies, and communal associations of all sorts.[22] In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), however, the Supreme Court explicitly recognized the potentially vague and overbroad character of the "political committee" definition in the context of FECA's disclosure requirements, and limited it appropriately.

The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. *The lower courts have construed the words "political committee" more narrowly. To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.*

424 U.S. at 79, 96 S.Ct. at 663 (footnotes omitted) (emphasis supplied).[23]

The *Buckley* Court felt that a more expansive definition of "political committee" would have been constitutionally dangerous, since once any group of Americans is found to be a "political committee" it must

---

**22.** *Cf. United States v. National Committee for Impeachment*, 469 F.2d 1135, 1142 (2d Cir. 1972) ("[o]n the Government's thesis every little Audubon Society chapter would be a 'political committee,' for 'environment' is an issue in one campaign after another. On this basis, too, a Boy Scout troop advertising for membership to combat 'juvenile delinquency' or a Golden Age Club promoting 'senior citizens' rights' would fall under the Act").

**23.** The Supreme Court went on to confine the definition of "expenditure" for purposes of the disclosure provision, section 434:

[W]hen the maker of the expenditure is not within these categories—when it is an individual other than a candidate or a group other than a "political committee"—the relation of the information sought to the purposes of the Act may be too remote. To ensure that the reach of § 434(e) is not impermissibly broad, we construe "expenditure" for purposes of that section in the same way we construe the terms of § 608(e)—to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.

424 U.S. at 79–80, 96 S.Ct. at 663–664 (footnotes omitted).

then submit to an elaborate panoply of FEC regulations requiring the filing of dozens of forms, the disclosing of various activities, and the limiting of the group's freedom of political action to make expenditures or contributions. The Court declared that such limitations "operate in an area of the most fundamental First Amendment activities." 424 U.S. at 14, 96 S.Ct. at 632. Specifically, the Court found only one "constitutionally sufficient justification" which would enable the contribution limitations of FECA to survive: "to limit the actuality and appearance of corruption resulting from large individual financial contributions" to candidates. *Id.* at 12–28, 96 S.Ct. at 631–639. *See also Common Cause v. Schmitt, supra,* 512 F.Supp. at 494. The Court made it clear that since the contribution limitations interfered with "fundamental First Amendment interests," *id.* at 23, 96 S.Ct. at 636, the means chosen by Congress to promote this important goal had to be "closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 S.Ct. at 638. The Court found that FECA's limitation on contributions to candidates and their political committees was "focus[ed] precisely" on "the narrow aspect of political association where the *actuality and potential for corruption have been identified ....*" *Id.* at 28, 96 S.Ct. at 639 (emphasis supplied).

■ But where a group's activities are not related in any way to a person who has decided to become a candidate, the "actuality and potential for corruption" are far from having been "identified." Draft groups may vary widely in character, from those wishing to encourage a particular individual's entrance as a candidate, to those encouraging a whole field of possible candidates, all of whom meet the group's particular policy or personal qualifications. Draft groups do have one thing in common, however: they aim to produce some day a candidate acceptable to them, but they have not yet succeeded. Therefore none are promoting a "candidate" for office, as Congress uses that term in FECA.[24] The Supreme Court has found, however, that unless a group is "under the control of a candidate or [its] major purpose ... is the nomination or election of a candidate," 424 U.S. at 79, 96 S.Ct. at 663, it cannot constitute a "political committee" under the Act. "Political committee" was defined in this way by the Court for the purpose of "focusing precisely" FECA's broadly worded provisions on "the narrow aspect of political association" which could constitutionally be restricted, because its potential for corruption had been specifically identified by Congress. "Draft" groups, however, neither fall within the Court's limited definition of political committees, nor has their potential for corruption been specifically identified by Congress.

The narrowing construction given to the words "political committee" by the lower courts which was endorsed in *Buckley* appeared in *United States v. National Committee for Impeachment,* 469 F.2d 1135 (2d Cir. 1972); *ACLU, Inc. v. Jennings,* 366 F.Supp. 1041 (D.D.C.1973) (three-judge court), *vacated as moot sub nom., Staats v. ACLU,* 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975); and *Buckley v. Valeo,* 519 F.2d 821 (D.C.Cir.1975) (*en banc*), *aff'd in part and rev'd in part,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). "[I]n the candid service of avoiding serious constitutional doubt,"[25] each of these courts attempted, as we shall attempt, to find a fair

---

**24.** The term "candidate" is one specifically defined under FECA:

"candidate" means an individual who seeks nomination for election, or election, to Federal office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, if he has (1) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, to Federal office, or (2) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office[.]

2 U.S.C. § 431(b).

**25.** *United States v. Rumely,* 345 U.S. 41, 47, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953).

reading of the statute which comports with first amendment safeguards. All three of these decisions recognized the grave constitutional difficulties inherent in construing the term "political committee" to include groups whose activities are not under the control of a "candidate," or directly related to promoting or defeating a clearly identified "candidate" for federal office.

In *National Committee for Impeachment* a group opposed to the Vietnam War spent over $17,000 to purchase a newspaper advertisement which reprinted a resolution introduced in the House of Representatives calling for the impeachment of President Nixon. The advertisement was published in May of a Presidential election year. The Committee asserted in the advertisement that it would devote its resources to any candidate for election or reelection to the House of Representatives, regardless of party, in the order in which they indicated support for the impeachment resolution. The United States obtained an injunction in the district court requiring the purchasers of the advertisement to register as a "political committee" under FECA, arguing that the advertisement was purchased and "made for the purpose of influencing" the outcome of the 1972 Presidential race, 2 U.S.C. § 431, and that the purchasers had publicly promised to support various candidates for federal office. In reversing the trial court's decision, the Second Circuit looked first to the statutory definitions of "political committee" and "contribution," and to the appropriate legislative history. The court found the legislative history entirely unenlightening, 469 F.2d at 1139, but did conclude that "[t]he words of the Act themselves point toward some more definite connection between candidate and committee than was here involved." *Id.* The court then declared:

> We thus construe the words "made for the purpose of influencing" in [section 431(e) and (f)] to mean an expenditure made with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate or his

agents. . . . We also construe the Act to apply only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates.

*Id.* at 1141.

The Second Circuit's interpretation of the words "political committee" was followed in *ACLU, Inc. v. Jennings, supra.* There plaintiffs sought declaratory and injunctive relief against enforcement of the disclosure provisions of FECA, alleging that the standards for determining when a group becomes a "political committee" under the Act were overbroad and vague, and imposed a chilling effect upon their exercise of first amendment freedoms since the provisions might be enforced against them. 366 F.Supp. at 1047, 1054–55. Recognizing the problem of overbreadth, the court adopted a "limited and narrow construction" of the Act in order to "remove any chilling effects worked upon the plaintiffs as well as obviate the necessity of this Court having to invalidate the [disclosure] Title." *Id.* at 1056. The court stated its "full agreement" with the *National Committee* test, which required that there be a clear connection between expenditures or contributions and a "candidate" for federal office. *Id.* at 1057. "We are satisfied," the court said,

> that by so construing the reaches of [the disclosure sections of FECA] the fears of constitutional infringements expressed by plaintiffs will be eliminated. They and other groups concerned with the open discourse of views on prominent national issues may, under both this ruling and that of the Second Circuit, comfortably continue to exercise these rights and feel secure that by so doing their associational rights will not be encroached upon.

*Id.* The third and final case cited by the Supreme Court, this court's decision in *Buckley v. Valeo, supra,* also expressly approved the limiting interpretations given to the words "political committee" in *National Committee* and *Jennings.*[26]

---

26. *Buckley v. Valeo, supra,* 519 F.2d at 863 n.112.

We recognize that *National Committee* and *Jennings* concerned so-called non-partisan, issue-oriented groups, not so-called "draft" committees. We also understand that at the time the statute was written and amended in 1971, 1974, and 1976, "draft" groups were either unheard of, or else not considered as a factor of sufficient importance in the political process to warrant concern by Congress.[27] But the question before us is not whether Congress specifically considered, and then exempted, "draft" groups from the contribution and disclosure requirements when it enacted and amended FECA; rather, the question is simply whether this statute—which nowhere mentions "draft" groups—should be read to imply coverage for such groups.[28]

In this delicate first amendment area, there is no imperative to stretch the statutory language, or read into it oblique inferences of Congressional intent to include "draft" groups. Achieving a reasonable, constitutionally sound conclusion in this case requires just the opposite. "It is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." [29] Unless, therefore, Congress made reasonably clear its intent to bring "draft" groups—organizations whose contributions and expenditures do not relate to an identifiable "candidate"—under the contribution limitations of section 441a, we must decline

to extend that provision to cover such groups so as to avoid the constitutional problems which *Buckley* and its lower court predecessors were able to avoid by narrowly construing the term "political committee."

In examining the legislative history, we find ourselves in agreement with the *National Committee* court that "Congress 'has voiced its wishes in muted strains and left it to the courts to discern the theme in the cacophony of political understanding.' " 469 F.2d at 1139. The legislative history of the term "political committee" is, in a word, uninformative, at least prior to 1979. But although not dispositive, we do find that the legislative history of the 1979 Amendments to FECA does shed some light on the question whether "draft" groups were, in 1979, considered by Congress to be subject to the contribution and disclosure provisions of the Act.

Prior to the 1979 Amendments, the reporting requirement of FECA mandated that "each treasurer of a political committee supporting a candidate or candidates for election to federal office . . . shall file with the Commission reports of receipts and expenditures on forms to be prescribed or approved by it." 2 U.S.C. § 434(a)(1). Effective January 8, 1980, however, the law was amended to delete any reference to "supporting a candidate or candidates for election to federal office," so that "draft" groups would be required to comply with

---

27. The Commission itself has stated, "obviously, Congress did not at that time [of the 1974 and 1976 Amendments to FECA] anticipate that draft committees would emerge as a phenomenon in the federal campaign process. Faced with such an aberration and with the task of determining how the statutory provisions should be applied under these circumstances, the court must resort to the process of projecting how the legislature would have dealt with this concrete situation had it been able to address it." FEC Memorandum in Reply to Respondent's Opposition, J.A. 18, 26.

28. Where regulatory agencies are confronted with new circumstances that create problems which Congress has not yet considered, courts frequently decline to permit expansion of regulatory jurisdiction into the new area. *See Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 422–24, 95 S.Ct. 1066, 1081–1082, 43 L.Ed.2d

279 (1975) (technological developments occurring after enactment of a statute do not in themselves justify expansion of jurisdiction of an agency beyond the scope described by Congress); *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 635–36, 92 S.Ct. 1827, 1836, 32 L.Ed.2d 369 (1972) (a newly arisen need for regulation cannot of its own force expand the reach of commission's jurisdiction).

29. *Richmond Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928). *See generally United States v. Rumely, supra,* 345 U.S. at 45, 47, 73 S.Ct. at 545–546; *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937); *Ashwander v. TVA,* 297 U.S. 288, 341, 346–47, 56 S.Ct. 466, 482–483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932).

the reporting requirement. The House Report on the FECA Amendments of 1979 stated

Each treasurer of a political committee is required to file reports of receipts and disbursements. Under the current Act, only treasurers of a political committee supporting a candidate or candidates were required to file. The change was made to insure that organizations set up to "draft" individuals who are not actually candidates will be required to report.

H.R.Rep.No.96–422, 96th Cong., 1st Sess. 15 (1979) U.S.Code Cong. & Admin.News 2860, 2874.

This change in the reporting requirements of FECA was the result of repeated efforts by the FEC to obtain jurisdiction over "draft" groups. As early as 1975 the Commission stated in its legislative recommendations:

Thought should be given to *amending the law* to make the *contribution limitations* applicable to draft movements. Under the present law, an individual is not a *candidate* unless he takes the action necessary to get on the ballot, makes or raises, or authorizes a person to make or raise, contributions or expenditures on his behalf or takes affirmative action to become elected to federal office.

FEC 1975 Annual Report at 79 (emphasis supplied). This statement clearly indicates that the Commission believed that "draft movements" were not covered by contribution limitations because they were not related to a "candidate," as that term is defined by statute. Again in 1976, the Commission stated:

The Congress may wish to consider amending the Act to bring draft movements within the *reporting provisions* and *contribution limitations.*

FEC 1976 Annual Report at 74–5 (emphasis supplied). Similar statements were made by the FEC in its 1977 and 1978 reports.[30]

In 1979 Congress finally accepted the Commission's recommendation to require that "draft" groups file reports as political committees. The writers of the House report apparently believed that "draft" groups should be treated as political committees for some purposes, at least. But there is no indication from the 1979 Amendments or the legislative history that such "draft" groups were to be bound by the contribution limitations.[31] Certainly no such inference can be made regarding the state of the law prior to 1979. Indeed not even a whisper about limiting contributions to "draft" groups has ever been heard in the legislative history of FECA. It is therefore clear that Congress has never acted expressly to bring "draft" groups within the coverage of contribution limitations.

All of this—the absence of any indication that Congress affirmatively intended to make "draft" groups political committees for contribution purposes; the Commission's admission that prior to 1979 Congress never even faced the issue of "draft" groups; the Commission's repeated pleas to *amend* the law to make the contribution limits applicable; Congress' limited response to such pleas, which addressed only the reporting issue; and, finally, *Buckley's* judicial gloss limiting the definition of "political committees" which could constitu-

---

**30.** *See, e. g.,* FEC Legislative Recommendations, *in* Federal Election Reform Proposals of 1977, Hearings Before the Senate Committee on Rules and Administration, 95th Cong., 1st Sess. 1050, 1067 (1977) ("The Congress may wish to consider amending the Act to bring draft movements within the reporting provisions and contribution limitations").

**31.** It would not have been unreasonable for Congress to require that "draft" groups report their activities, but not be bound by contribution or expenditure limitations. The *Buckley* opinion—which has formed much of the legislative debate over FECA since 1975—men-

tioned several times that FECA's disclosure provisions serve independent functions from the contribution and expenditure limits, among them, promoting more informed voting by providing the electorate with information about candidates' financial supporters. *Buckley v. Valeo, supra,* 424 U.S. at 76, 81, 83, 96 S.Ct. at 662, 664, 665. Also, it could hardly have escaped Congressional notice that the appellants in *Buckley* did not even allege that the disclosure provisions—in contrast to the contribution and expenditure limits—were *per se* unconstitutional. *Id.* at 60, 96 S.Ct. at 654.

tionally be regulated—compels us to conclude that the Commission lacked subject matter jurisdiction over allegations that groups seeking only to "draft" Senator Kennedy to become a "candidate" some time in the future have violated the contribution limitations of FECA. Whatever the post-1979 situation, it is clear to us that in this case the contribution limitations did not apply to the nine groups whose activities did not support an existing "candidate," but merely represented attempts to convince the voters—or Mr. Kennedy himself—that he would make a good "candidate," or should become a "candidate."

## IV. CONCLUSION

In order to insure that the Commission's investigations comport with the fundamental first amendment interest in guarding constitutionally protected information from unlawful disclosure, we believe that when a serious and novel question of the Commission's subject matter jurisdiction is presented, an essential prerequisite for enforcing an FEC subpoena is a determination by the district court that subject matter jurisdiction exists for the investigation. Since the FEC lacked jurisdiction to control "draft" group contributions, the subpoena should not have been enforced.

■ There may be cases, however, where the Commission asserts a need for additional factual information before a decision on the jurisdictional question can reasonably be made. *Cf.* text at note 19 *supra.* If the court so finds, then it may adopt a two-step procedure similar to one used in *Reader's Digest Ass'n v. FEC*,[32] a procedure designed to strike an appropriate balance between the need for effective investigations and the preservation of first amend-

---

**32.** In *Reader's Digest Ass'n v. FEC*, 509 F.Supp. 1210 (S.D.N.Y.1981), plaintiff, a magazine publisher, sued to enjoin the Commission from proceeding with an investigation into whether it had violated section 441b(a) by making expenditures to disseminate to other media outlets videotapes of a computer reenactment of Senator Edward Kennedy's accident at Chappaquiddick. *Id.*, at 1211. Reader's Digest claimed that it was exempt from FEC's jurisdiction pursuant to a statutory provision excluding certain activities from coverage under FECA, 2 U.S.C. § 431(9)(B)(i). Although the court declined to enjoin the investigation because no subpoena had yet been issued, *id.* at 1216, the court did express its concern over the authority of the Commission to conduct its investigation.

[T]his dispute involves First Amendment considerations based on a recognition that freedom of the press is substantially eroded by investigation of the press, even if legal action is not taken following the investigation. Those concerns are particularly acute where a governmental entity is investigating the press in connection with the dissemination of political matter.... Both the Constitution and the statutory exemption for press activities suggest that ... judicial scrutiny [at] a later stage in the administrative process is not properly applicable to these circumstances. This is easily demonstrated in the context of a more extreme example: If a newspaper relying on a secret source were publishing a series of articles containing derogatory information about the incumbent President during his campaign for reelection, and the FEC undertook to investigate the newspaper asking among other questions the source of the information published, could it seriously be contended that an application by the newspaper for judicial intervention would be premature because of the preliminary stage of the FEC's proceedings? In my view the statute, in creating an exemption for the press in its news and opinion dissemination function, demands the FEC not even to investigate such circumstances and authorizes court intervention if the FEC oversteps the limitation.

*Id.* at 1214.

Because factual questions existed regarding whether the Commission had statutory authority to conduct its investigation, the court adopted a two-step process to govern its continuation. In the first stage, the only investigation permitted would be for the purpose of determining whether jurisdiction existed, *i. e.,* to gather the facts helpful in deciding whether the statutory exemption properly applied to plaintiff. Only if the Commission found probable cause that the press exemption did *not* apply, would further investigation then be permitted into whether the substantive violation had occurred. *Id.* at 1214–1215. The court stated

No explicit reference is to be found in the statute to this two-step process. It seems to me, however, to be the necessary accommodation between, on the one hand, the Commission's duty to investigate possible violations and, on the other, the statutory exemption for the press combined with a First Amendment distaste for government investigations of press functions.

*Id.* at 1215.

ment liberties.[33] Initially, the court may enforce a subpoena limited to that information which will allow the FEC to ascertain whether it does or does not have jurisdiction. If jurisdiction for a full investigation appears to exist, a broader subpoena seeking evidence of a violation may then be enforceable.

In this case, for example, the FEC may now wish to proceed with its investigation on another jurisdictional basis, alleging, for example, that these pro-Kennedy groups were, or may have been, operating on behalf of *candidate* Kennedy. A subpoena requesting information about when Senator Kennedy actually became a candidate might, in such a case, be enforceable. If after this jurisdictional investigation the Commission can demonstrate subject matter jurisdiction by showing, for example, that Senator Kennedy was a "candidate" after August 17, 1979, then a second, broader, subpoena may follow.

But a sweeping demand by the FEC for membership lists and internal communications of a political group over which no showing of jurisdiction has been made cannot now be approved by this court without ignoring vitally important constitutional freedoms by which Americans conduct their political affairs. The district court's order is therefore vacated, and the matter is remanded for further proceedings consistent with this opinion.

*Order vacated; case remanded.*

---

**33.** *Cf. SEC v. McGoff, supra* note 16.