FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

GOPAC, INC., Defendant.

Civil A. No. 94–0828–LFO.

United States District Court,
District of Columbia.

Feb. 29, 1996.

Lawrence M. Noble, General Counsel, Richard B. Bader, Associate General Counsel, Stephen E. Hershkowitz, Assistant General Counsel, Robert W. Bonham, III, Senior Attorney, Washington, DC, for Plaintiff.

Peter E. Derry, Pyne & Derry, P.C., Chevy Chase, Maryland, for Defendant.

## *MEMORANDUM*

OBERDORFER, District Judge.

### I.

On April 14, 1994, the Federal Election Commission filed this civil action against GOPAC, Inc., alleging that in 1989 and 1990 GOPAC was a "political committee" which had failed to register and report as required by the Federal Election Campaign Act, 2 U.S.C. §§ 433(a) and 434(a). The allegation had its origins in an administrative complaint filed by the Democratic Congressional Campaign Committee with the Commission in September 1990 that GOPAC's receipts and expenditures for its "Campaign for Fair Elections" project made it a "political committee" as defined in the Act. Over three

years later, after the Commission concluded its investigation, on December 9, 1993, it notified GOPAC that there was probable cause to believe that it was a "political committee," obligated by the Act to register and report. The Commission attempted to enter into a conciliation agreement with GOPAC. When conciliation failed, the Commission filed the complaint in this case, centered on the "Campaign for Fair Elections" project.

On June 20, 1994, GOPAC moved to dismiss the complaint for failure to state a claim, contending that in 1989 and 1990 it confined itself to supporting state and local candidates and affirmatively refrained from supporting the election or defeat of any federal candidate. A December 23, 1994 Memorandum and Order denied defendant's motion to dismiss in order to allow the Commission to establish, if it could, that in 1989 and 1990 GOPAC's major purpose was to elect a particular federal candidate or candidates. Although the complaint did not clearly allege that GOPAC supported any particular federal candidate or candidates, it was sufficiently broad to encompass proof to that effect. The Memorandum and Order made no ruling on the Commission's claim that the "Campaign for Fair Elections" mailings stated a cause of action. *FEC v. GOPAC, Inc.*, 871 F.Supp. 1466, 1470 (D.D.C.1994). Thereafter, the parties proposed, and the Court adopted, a schedule for extended discovery, briefing, and argument. They have now filed cross-motions for summary judgment, supported by copious statements with respect to material facts, more than 6,000 pages of exhibits, and six audiotapes. During the briefing period, Common Cause filed a memorandum as *amicus curiae*. After oral argument, the matter is ready for decision on cross-motions for summary judgment.

## II.

The parties have clearly framed the legal issue in the exchange of briefs. The Commission argues essentially that in 1989 and 1990, GOPAC was a "political committee" required by the Act to register because (1) its "major purpose [was] electoral activity," and (2) it made expenditures and received contributions of $1,000 or more for the purpose of influencing federal elections. *See* Pl.'s Mot. at 10; Pl.'s Opp'n at 3. GOPAC counters that this statement of the law—which classifies organizations on the basis of degree of "election orientation"—requires an impermissible, subjective determination by the Commission and by the courts. *See* Def.'s Reply at 4–5. According to GOPAC, the Act and controlling legal precedents establish more objective criteria for determining whether an organization receiving contributions of $1,000 or more is a "political committee," namely: whether its expenditures in cash or in kind evidence the organization's major purpose to be the supporting of a particular candidate or candidates for federal office. Emphasizing that, as the Commission concedes, GOPAC made no direct contributions to federal candidates in 1989 and 1990, GOPAC contends that it was not a "political committee" in those years.

## III.

Undisputed material facts distilled from the exchange between the parties establish the following: GOPAC was founded in 1979 by then-Governor Pierre S. DuPont IV to fund Republican candidates for state legislatures. Since 1983, GOPAC has been incorporated as a non-profit corporation under the laws of the District of Columbia. Pl.'s Statement ¶ 1. During the relevant time period, its Articles of Incorporation stated its purpose to be "to influence or attempt to influence the nomination for election of candidates for state legislative office; but in no event shall contributions be made to, or for the benefit of, candidates for federal office." Def.'s Ex. 1. By 1989, GOPAC had spent more than $4 million in direct contributions and political programs on behalf of state and local Republican candidates. Pl.'s Statement ¶ 39; Pl.'s Ex. 66 at 5926; Def.'s Response ¶ 39. Its state and local candidate contributions declined thereafter. On May 1, 1991, GOPAC registered with the Commission as a "political committee" and, on July 31, 1991, filed its first report of receipts and expenditures. Since February 1992, GOPAC "has filed monthly reports of its receipts and disbursements with the Commission" and has "reported its shared federal/non-federal activity as ten per cent federal and ninety per

cent non-federal." Pl.'s Ex. 7 (Decl. of Kent C. Cooper, Commission Custodian of Records).

Beginning in 1984, GOPAC undertook to help the Republican Party "to become competitive in more congressional districts" and "to win a majority in the U.S. House of Representatives." Pl.'s Ex. 66 at 2991. Toward this end, GOPAC targeted its support for Republican candidates for state legislatures "with an eye to 1991," when reapportionment of congressional districts to reflect the results of the 1990 census would begin. In addition, GOPAC began to recruit and support candidates for state legislatures who could become a "farm team" of "promising future congressional candidates in congressional districts where there may not be a possibility of winning a seat right away, but where voting demographics show there is Republican voting strength and that with the right candidate and sufficient Party support, a win can be ours." *Id.*

In 1986, Congressman Newt Gingrich succeeded Governor DuPont as GOPAC General Chairman. Congressman Gingrich was also an individual candidate for reelection in 1986, 1988, and 1990. As GOPAC's General Chairman, the Congressman proposed its reorientation to reflect his belief that "the primary problem with the Republican Party was ideas, not money." Pl.'s Ex. 23 at 15 (Newt Gingrich Dep., Sept. 26, 1995). He saw GOPAC's "niche as a very unique research and development and training kind of institution [for candidates]." *Id.* at 23. Other Republican leaders "were pretty amenable to [the] idea of making [GOPAC] an idea-oriented institution." *Id.* at 15. As GOPAC's General Chairman, the Congressman tried to "think through the general direction for where we were going and to try to do the teaching and then to engage in those specific fundraising activities." *Id.* at 11. After he became General Chairman, GOPAC shifted away from making large contributions to Republican state candidates and parties, and by 1987, began providing candidate training, communications, and focus group research results to Republican candidates, party organizations, and activists. *See* Pl.'s Ex. 19 at 42 (GOPAC

Political Director Tom Morgan Dep., June 21, 1995).

During 1989, GOPAC adopted a formal "mission statement" which reiterated its ultimate objective "to create and disseminate the doctrine which defines a caring, humanitarian, reform Republican Party in such a way as to elect candidates, capture the U.S. House of Representatives and become a governing majority at every level of government." Pl.'s Ex. 66 at 281; Def.'s Ex. 73. Congressman Gingrich stated that "[t]here was no question that the ultimate goal of GOPAC was to create a state and local farm team of sufficient depth that, as a result of that level of recruitment and energy, the party would be large enough to win control of the House." Def.'s Ex. 75. This focus on state and local elections reflected GOPAC's view that "[c]apturing the U.S. House of Representatives, as envisioned by GOPAC, could only be accomplished by building a farm team and changing the balance of grass roots political power." Def.'s Statement ¶ 50; Pl.'s Response ¶ 12.

In 1989, as part of its "farm team" program, GOPAC mailed a questionnaire to every Republican state legislator inquiring whether he or she would "consider a campaign for Congress in your future." *Id.* ¶ 178; Pl.'s Ex. 66 at 5688; Def.'s Response ¶ 178. From this mailing, GOPAC compiled a list of more than 500 prospective candidates. Seventeen of the GOPAC farm team members who expressed an interest in running for Congress in response to the questionnaire actually ran for Congress in 1990. Pl.'s Statement ¶ 181; Def.'s Response ¶ 181. When farm team members running for Congress in 1990 asked for contributions from GOPAC, their requests were conspicuously turned down. *See* Tr. at 19.

GOPAC's direct mail fundraising efforts reinforced and reiterated GOPAC's statement of its "mission." In 1989 and 1990, GOPAC conducted a "Campaign for Fair Elections," a "project that directly attack[ed] two of the most blatant ways [the franking privilege and gerrymandering] the Democrats [in Congress] keep themselves in power." Pl.'s Ex. 1 at 2. Then–Speaker Jim Wright was a prominent target in the "Cam-

paign." In a May 30, 1989 letter, Congressman Gingrich described Speaker Wright as a "corrupt Democrat"; Speaker Wright and his fellow Democratic Congressmen have "entrenched themselves into a permanent majority in Congress. It's now practically impossible to defeat a sitting member of the House." Pl.'s Ex. 30 at 2709. Congressman Gingrich further stated that "I truly believe GOPAC's Campaign for Fair Elections will defeat or seriously weaken a large number of Democrats in 1990. That gives us the momentum we need to sweep in a majority of Republicans in 1992—the first election after the districts are re-drawn. Our plan is ambitious. We're aiming to overturn a Democrat reign that's lasted 35 years." Pl.'s Ex. 30 at 2711. A June 27, 1989 letter requested contributions to the "Campaign for Fair Elections" and concluded that "[w]ith your help, we can break the liberal Democrats' iron-grip on the House of Representatives and build a new Republican majority." Pl.'s Ex. 1 at 4. That letter and others proposed, as a remedy, eliminating the franking privilege, which gave incumbents an advantage over challengers, and defeating the Democrats at the gerrymandering "game." The letters also asked for contributions to state and local Republican candidates. GOPAC distributed approximately 25,277 copies of the June 27, 1989 "Campaign for Fair Elections" letter to the persons on its mailing list at a cost of $15,521. GOPAC received $35,657 in contributions from that mailing. Pl.'s Statement ¶ 238. From June 1989 through August 1990, GOPAC's direct mail firm distributed another 773,515 copies of the "Campaign for Fair Elections" letters to the general public at a cost of $265,291. GOPAC received $240,053 in contributions from these mailings. Id. ¶ 239.

A GOPAC mailing dated August 12, 1988 and unrelated to the "Campaign for Fair Elections" or the 1989–1990 election cycle, referred to then-Vice President Bush's 1988 campaign for election and requested the recipient to "sign the personal message of support to Vice President Bush that I've enclosed with my letter." Pl.'s Ex. 29 at 2686. The proposed personal message stated to President Bush that "You can count on my vote Election Day and my commitment to help you carry forward the Reagan agenda into the 1990's." Id. at 2689.

In addition to its direct mail efforts, GOPAC raised funds by recruiting and soliciting contributions from its Charter Members. Def.'s Statement ¶ 20; Pl.'s Statement ¶ 249. Charter Members are individuals who contribute $10,000 or more annually to GOPAC. Def.'s Statement ¶ 22. GOPAC held semiannual meetings for Charter Members at which they met with "cabinet members, members of Congress and other Republican officials." Id. ¶ 25; Pl.'s Statement ¶ 256. At the May 1989 meeting, "Democracy in China," "Ethics and Congress," and "The New House Whip System" figured prominently on the agenda. Def.'s Ex. 44. At the November 1989 meeting, Charter Members attended, among other things, "Briefings with Cabinet Members and other White House Officials" at the Old Executive Office Building. Id.

Summaries of campaign finance reports already on file with the Commission reveal that in 1989 and 1990, Charter Members contributed a total of $539,328 to Republican candidates for the House of Representatives, 23% of which ($124,503) went to Congressman Gingrich's campaign committee and 3.5% of which ($19,050) went to Congressman Joe Barton's campaign committee, the next largest beneficiary of GOPAC Charter Members' contributions. See Pl.'s Ex. 10 (Decl. of Robert W. Biersack, Commission Supervisory Statistician).

In 1990, in response to an apparent inquiry from a Charter Member, GOPAC Political Director Tom Morgan identified the "four Congressional campaigns ... I believe to be the most important in the nation." Pl.'s Ex. 66 at 5519. He described a campaign for a congressional seat in Idaho as a "[h]otly contested race, high on our national list" and the Republican candidate as a "great candidate." Id. The Charter Member subsequently contributed a total of $1,500 to Republican candidates in three of those campaigns and reported the contributions to the Commission. Pl.'s Statement ¶¶ 204–05; Pl.'s Ex. 42; Def.'s Response ¶¶ 204–05. Another contributor wrote to GOPAC Chairman Bo Callaway

on September 5, 1990, telling him "[y]ou'll be glad to know that we have 'maxed out' to both Newt's and [congressional candidate] John Linder's campaigns." Pl.'s Statement ¶ 207; Pl.'s Ex. 66 at 4283; Def.'s Response ¶ 207. On one occasion, a GOPAC Charter Member from Kansas City, Missouri enclosed his $10,000 membership check with a letter addressed to the "Honorable Newt Gingrich" at his GOPAC office summarizing the Member's financial support to GOPAC over five years and requesting an appointment with Congressman Gingrich "in connection with the asbestos regulations," which were costing his company "millions and millions of dollars." Pl.'s Ex. 66 at 4854–55 (Jan. 19, 1990 letter to Congressman Gingrich from Miller Nichols). Congressman Gingrich answered on GOPAC stationery over his signature as General Chairman: "I want you to know how very much I appreciate your generous contribution! ... Regarding the problematic asbestos regulations— please send me a copy of your research when you are finished and I will look into it." Pl.'s Ex. 66 at 4858 (Jan. 25, 1990 letter to Miller Nichols from Congressman Gingrich). On another occasion, a Charter Member wrote to Congressman Barton enclosing a $10,000 check to GOPAC and thanking him for his assistance in "our dumping case against Mexican cement producers." Pl.'s Ex. 66 at 4807 (Sept. 27, 1989 letter to Congressman Barton from Edgar J. Marston III). There is no showing that either Congressman Gingrich or Congressman Barton had announced for reelection at the time of these exchanges.

GOPAC also "undertook research to develop and articulate an effective Republican message." Def.'s Opp'n at 15–16. In particular, GOPAC convened "shirtsleeve sessions," which provided "themes and message development for state and local Republican candidates," and "focus groups," which identified and defined political issues that would motivate voters in various regions of the country. Def.'s Statement ¶¶ 27–34; Pl.'s Statement ¶¶ 88–104. GOPAC "shirtsleeve sessions" dwelt on national issues facing Congress, including "Congressional reform," "campaign reform," "taxes and fiscal growth," and "regulatory reform." Pl.'s Statement ¶ 64. GOPAC advocated a "the-

matic approach which allows all of the campaigns to be able to subsume themselves into a larger pattern so that ... you create an echo effect, a resonance, which fits about 88 percent of the country." Pl.'s Ex. 23 at 38 (Gingrich Dep.). GOPAC publicized and distributed these results around the country in the form of audiotapes and videotapes. Def.'s Statement ¶ 34; Pl.'s Statement ¶¶ 138–47. During 1989, GOPAC mailed more than 45,000 copies of new audiotapes. During 1990, GOPAC mailed 36,000 copies of six other new audiotapes. Pl.'s Statement ¶ 141; Def.'s Response ¶ 141. According to Director Morgan, it was "certain that members of Congress wound up with copies of the tapes," and likely that there were federal candidates on GOPAC's mailing list. Pl.'s Statement ¶ 147 (citing Pl.'s Ex. 19 at 162–63, 111 (Morgan Dep.)). Indeed, a GOPAC letter to Charter Members and other potential contributors in July 1989 reported its plan to conduct training and other programs, including " 'immersion' programs for GOP candidates at all levels within specific states." Id. at ¶ 270.

In 1990, GOPAC initiated "Project 170," which focused on "recruiting, training and funding strong local and state candidates in specific congressional districts, with the expectation that successful candidates at the state and local level would run for higher office in the future." Def.'s Statement ¶ 47; Pl.'s Statement ¶¶ 195–96. GOPAC selected 170 congressional districts because this was "the number of congressional seats GOPAC believed necessary to win control of Congress." Pl.'s Statement ¶ 195; Def.'s Response ¶ 195. A "Project 170" district was a district "chosen by our demographer, Tom Morgan, based on an analysis of the district," where "the possibility existed that it could be a Republican congressional district." Pl.'s Ex. 21 at 124 (Dep. of Kay Riddle, GOPAC Executive Director, Aug. 24, 1995). Ms. Riddle further testified in response to questions:

Q: And that is where GOPAC focused its state contributions?

A: No, not—not early on.

Q: But—

A: We hadn't even identified the districts.

Q: But by 1990—

A: By 1990, Tom Morgan had identified districts.

Q: And campaign contributions and training was made to Republican candidates for state legislative offices in those districts?

A: *Yes, and in other districts.*

*Id.* at 124–25 (emphasis added).

As a corollary to its "farm team" efforts, which would, in GOPAC's view, help win the U.S. House of Representatives for the Republican Party "some day" (i.e., 1992 or 1994), GOPAC planned an indirect role in contemporaneous 1990 congressional elections. Director Morgan advanced the concept of "reverse coat tails," a term which expressed his idea that "strong [state] legislative efforts produce more for the top of the ticket than the top does for legislative campaigns." That is, a "strong, active, visible, cohesive legislative effort can give the top of the ticket enough extra weight to win." Pl.'s Ex. 66 at 3943 (June 1, 1990 Memorandum from Tom Morgan to Bo Callaway, Chairman of GOPAC, and Kay Riddle [hereinafter "Morgan Memorandum"]). GOPAC also concentrated support for Republican candidates for state legislatures where redistricting could be advantageous to Republican candidates for Congress.

To this end, at the time of the 1990 congressional elections, Tom Morgan recommended that fifteen states "receive [t]he bulk of GOPAC attention for the rest of the [1990] election" campaign. *Id.* at 3944. One of the criteria used by GOPAC to determine where "it could have an impact on elections" and thus where it should "target" its efforts was whether there was "an important governor's race or a key U.S. Senate campaign." *Id.* at 3943. For example, in 1989, GOPAC directly supported Dr. Keith Butler, a candidate for the Detroit City Council, because

> the stakes are bigger than just the city of Detroit. There is the whole of Michigan, with a U.S. Senate election up this year. We win statewide when we get at least 23% in Wayne County. We lose the state when we get our usual 19% in Wayne County. As a City Councilor, Dr. Butler

will have a forum to help get at least the 23% we need to win the Senate race.

Pl.'s Ex. 66 at 3785 (Sept. 27, 1989 letter from Congressman Newt Gingrich to Mr. and Mrs. Stanley Gaines). Montana made the list of fifteen states because, in part, "there is a US Senate race that could benefit from significant legislative activity." Pl.'s Ex. 66 at 3945 (Morgan Memorandum). "We believed a strong [state] legislative effort [in Montana] could provide the base needed to win this important seat." Pl.'s Ex. 66 at 3898 (GOPAC 1990 Political Report & Election Results). GOPAC also targeted "three [state] legislative seats in [Texas] to help create ground swell" for State Representative Dick Waterfield's 1990 run for Congress. Pl.'s Ex. 66 at 5519 (Aug. 29, 1990 Memorandum from Tom Morgan to Kay Riddle).

None of the Republican candidates for federal office in the states recommended for attention by Morgan was identified by name, but the candidates are identifiable. In response to a January 29, 1996 Notice to Counsel, both parties have furnished a list of congressional candidates in the targeted districts.

GOPAC avoided *directly* supporting federal candidates. The Commission recognizes that "there is no evidence of a GOPAC cash contribution to a federal candidate's campaign prior to its registration." Pl.'s Opp'n at 4. Kay Riddle, speaking of herself and Bo Callaway, testified in her deposition that "Bo and I both came out of the state party. And if there is anything you learn when you are running a state party, it is the difference between federal and local elections. And we were very careful not to—not to get involved in anything federal." Pl.'s Ex. 21 at 123 (Kay Riddle Dep., Aug. 24, 1995); *see also* Def.'s Statement ¶ 57; Pl.'s Response ¶ 57. When a "farm team" member decided to run for Congress, "he or she was referred to the [National Republican Campaign Committee]." Def.'s Statement ¶ 53; Pl.'s Response ¶ 53. GOPAC registered with the Commission on May 8, 1991 only after "extensive discussions in late 1990 through the Spring of 1991 concerning the nature of activities it was considering undertaking, including the legal, financial, organizational and other im-

plications of such a decision." Def.'s Statement ¶ 58; Pl.'s Response ¶ 58. The record includes a letter by Counsel to GOPAC, Daniel J. Swillinger, advising GOPAC that because "GOPAC activities are conducted only at the state and local level," they "are not regulated by Federal law or the Federal Election Commission." Pl.'s Ex. 66 at 2068 (Feb. 25, 1988 letter to Honorable Newt Gingrich, General Chairman, GOPAC, from Daniel J. Swillinger). Prior to its registration, GOPAC proceeded on the assumption that "all of the things that we are now doing can be done within the existing legal structure of GOPAC." Pl.'s Ex. 66 at 292–93.

GOPAC financed assistance to Congressman Gingrich in his capacity as "chief catalyst and thinker of the organization, as developer, with the assistance of the various consultants, of the ideas which GOPAC used and 'to help Newt think'." Def.'s Response ¶ 214. In his August 13, 1990 Memorandum to Congressman Gingrich, Bo Callaway stated that "there are three broad things that GOPAC does: 1. Traditional GOPAC. 2. Newt support. 3. Projects such as ACTV, AOW and focus groups." Pl.'s Ex. 66 at 3993. *See infra* at 862–63. Callaway also noted that "regular funding for GOPAC, to include Charter and direct mail, should be spent for Traditional GOPAC and Newt support." *Id.*

In summary, the undisputed facts establish that in 1989 and 1990:

1. Although GOPAC's *ultimate* major purpose was to influence the election of Republican candidates for the House of Representatives, GOPAC's immediate major purpose in 1989 and 1990 was to elect state and local candidates and to develop ideas and circulate them generally to Republican party candidates and supporters including, but not limited to, unidentified Republican candidates for federal office. In 1990, GOPAC distributed its materials and services in a wholesale manner, which included distribution to candidates for federal office, among others, but the distribution was not targeted to federal candidates.

2. GOPAC made direct contributions to Republican candidates for state legislatures where the 1990 census indicated that reapportionment favorable to Republican federal candidates was a prospect, and made contributions to some Republican local and state candidates where the support might *indirectly* influence the election of others on the Republican ticket, including candidates for federal office.

3. GOPAC did not make any direct contribution to any particular federal candidate.

4. There is no proffer of admissible, material evidence in the record that the materials and services which GOPAC provided to support Congressman Gingrich's work as GOPAC General Chairman were used by GOPAC or by him to support his reelection campaign.

## IV.

### A.

The Act defines a "political committee" as "any committee, club, association, or other group of persons which receives *contributions* aggregating in excess of $1,000 during a calendar year or which makes *expenditures* aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A) (emphasis added). Under the Act, a "contribution" is "any gift, subscription, loan, advance, or deposit of money or *anything of value* made by any person *for the purpose of influencing any election for Federal office.*" *Id.* § 431(8)(A)(i) (emphasis added). The Act also defines "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or *anything of value* made by any person *for the purpose of influencing any election for Federal office.*" *Id.* § 431(9)(A)(i) (emphasis added). Once a group is found to be a "political committee," it must "then submit to an elaborate panoply of FEC regulations requiring the filing of dozens of forms, the disclosing of various activities, and the limiting of the group's freedom of political action to make expenditures or contributions." *FEC v. Machinists Non–Partisan Political League,* 655 F.2d 380, 392 (D.C.Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981).

In *Buckley v. Valeo,* the Supreme Court cautioned that the broad statutory definition

of "political committee," which turns on the terms "contribution" and "expenditure," and on the phrase "for the purpose of influencing any election," had "the potential for encompassing both issue discussion and advocacy of a political result" and thus might encroach upon First Amendment values. 424 U.S. 1, 79, 96 S.Ct. 612, 663, 46 L.Ed.2d 659 (1976). As our Court of Appeals has explained, the *Buckley* Court "explicitly recognized the potentially vague and overbroad character of the 'political committee' definition in the context of [the Act's] disclosure requirements." *Machinists*, 655 F.2d at 391. Therefore, the Supreme Court stated that to fulfill the purposes of the Act, the term "political committee" "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Buckley*, 424 U.S. at 79, 96 S.Ct. at 663.

■ The "major purpose" test treats an organization as a "political committee" if it receives contributions and/or makes expenditures of $1,000 or more and its "major purpose" is the nomination or election of a particular candidate or candidates for federal office. The organization's purpose may be evidenced by its public statements of its purpose or by other means, such as its expenditures in cash or in kind to or for the benefit of a particular candidate or candidates. *See, e.g., FEC v. Massachusetts Citizens For Life*, 479 U.S. 238, 262, 107 S.Ct. 616, 630, 93 L.Ed.2d 539 (1986). Circuit precedent indicates, however, that even if the organization's major purpose is the election of a federal candidate or candidates, the organization does not become a "political committee" unless or until it makes expenditures in cash or in kind to support a "person who has decided to become a candidate" for federal office. *See Machinists*, 655 F.2d at 392. As our Court of Appeals has observed, " 'Political committee' was defined in this way by the [*Buckley* ] Court for the purpose of 'focusing precisely' FECA's broadly worded provisions on 'the narrow aspect of political association'

which could constitutionally be restricted, because its potential for corruption had been specifically identified by Congress." *Id.* Therefore, "where a group's activities are not related in any way to a person who has decided to become a candidate, the 'actuality and potential for corruption' are far from having been 'identified.' " *Id.* Relying on *Buckley* and subsequent cases in this Circuit interpreting *Buckley*, this Court's December 23, 1994 Memorandum and Order denied defendant's motion to dismiss in order to give the Commission an opportunity to address "the controlling relevant legal question ... [of] whether, at the times in question, the *organization*'s 'major purpose ... [was] the nomination or election' of an identified candidate or candidates for *federal* office." *FEC v. GOPAC, Inc.*, 871 F.Supp. 1466, 1471 (D.D.C.1994) (quoting *Buckley*, 424 U.S. at 63, 96 S.Ct. at 655) (emphasis added).

The Commission, as well as *amicus* Common Cause, here challenge the application of the major purpose test to GOPAC. The Commission argues essentially that the constitutional considerations addressed in *Buckley* concern "only groups primarily devoted to issue advocacy or other non-electoral pursuits." Pl.'s Reply at 5 (citing *Buckley*, 424 U.S. at 80 n. 107, 96 S.Ct. at 663 n. 107). Consequently, *Buckley* does not require the Commission to show that GOPAC's "major purpose" was the election of a particular, identified candidate or candidates. Instead, the Commission argues here for a broader—and troubling—interpretation of the Act. Under the Commission's interpretation, an organization need not support the "nomination or election of a candidate," but need only engage in "partisan politics" or "electoral activity." The Commission defends this interpretation on the ground that a "loophole" would be opened if an organization could make unreported expenditures for partisan political purposes, so long as they were not traceable to a federal candidate.[1] Accordingly, under the Commission's test, if GOPAC engaged in "partisan electoral politics"—that

---

1. It is noteworthy that in its opposition to the petition for rehearing *en banc* in *Akins v. FEC*, 66 F.3d 348 (D.C.Cir.1995), *vacated and reh'g granted en banc*, 74 F.3d 287 (D.C.1996), the Commission supports the formulation of the *Buckley* test

as relied upon in the December 23, 1994 Memorandum and Order and cites with approval *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C.Cir.1981). *See* Opp'n to Pet. for Reh'g at 4–11.

is, advocated "the election of a specified class of candidates, such as all Republicans"—its expenditures " 'are, by definition, campaign related.' " Pl.'s Mot. at 7, 11 (quoting *Buckley*, 424 U.S. at 79, 96 S.Ct. at 663). And if its expenditures or contributions exceed $1,000, GOPAC would be required to register with the Commission. *See id.* at 7. Similarly, Common Cause appears to argue that "electioneering" is sufficient; thus, expenditures for advertisements that say "Elect a Republican to the White House in '96," even before a Republican is nominated, would satisfy the Act as interpreted by *Buckley*. Common Cause Mem. at 4.

For legal authority for this proposition, the Commission cites three advisory opinions that the term "political committee" includes "groups whose sole purpose is to support the election of a category of candidates for office—such as all Republicans—at any electoral level." Pl.'s Mot. at 14. *See generally id.* at 13–20. It argues that this interpretation is entitled to *Chevron* deference. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). GOPAC responds that two of the advisory opinions are distinguishable from the instant case because they relate to proposed communications to the public advocating electoral action (and antedate several court decisions narrowing the definition of "expenditure" under the Act). In the third, "the requestor [of the advisory opinion] clearly intended to engage in activity directly benefiting an existing and definite group of federal and non-federal Republican candidates." Def.'s Opp'n at 10–12.

Distinguishable or not, the Commission's advisory opinions are not entitled to *Chevron* deference because they are necessarily based upon the Commission's interpretation of the Constitution as construed by the Supreme Court and our Court of Appeals. As the latter court recently held in a related context, the Commission's construction of another provision of the Act was not entitled to *Chevron* deference because that construction raised serious First Amendment difficulties. *See Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C.Cir.1995). In that case, the Court of Appeals examined the Commission's interpretation of the Act's provision regarding "members" to whom a membership organization may convey political messages and solicitations without violating the Act. The Commission's interpretation effectively limited the definition of "members" to individuals with the right to vote for at least one member of the organization's highest governing body. The Court of Appeals refused to defer to the Commission's constitutionally troublesome interpretation, observing that the Commission's narrow definition burdened the organization's First Amendment right to communicate with its members and that courts are "obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress." *Id.* The Court of Appeals has also observed, with respect to the Commission's interpretation of constitutional claims, that "[i]t was hardly open to the Commission, an administrative agency, to entertain a claim that the statute which created it was in some respect unconstitutional." *Robertson v. FEC*, 45 F.3d 486, 489 (D.C.Cir. 1995). The court cautioned that even if deference were appropriate, "the Commission's elastic interpretation" of the statute at issue in that case might impermissibly "stretch[ ] *Chevron* deference beyond its reach." *Id.* at 490.

The statutory provision entitling the Commission to deference here relates only to "the Commission's *dismissal* of a complaint[, which] should be reversed only if 'contrary to law.' " *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) (emphasis added) (quoting 2 U.S.C. § 437g(a)(8)). In this case, of course, the Commission has not dismissed a complaint; it is prosecuting alleged violations of the Act. The Commission has merely "authorized the General Counsel to institute a civil action for relief" based on its finding of "probable cause to believe that" GOPAC violated the Act. Pl.'s Feb. 6, 1996 Notice of Filing Ex. 6 (Letter to Gordon M. Strauss from Lawrence M. Noble, Commission General Counsel, Feb. 4, 1994). The Act does not provide for deference in this situation. Therefore, because the Commission's interpretation of "political committee" is not entitled to deference by

statute and because it raises serious First Amendment difficulties, under judicial precedent in this Circuit, the validity of the Commission's interpretation of "political committee" must be determined on its own terms. *But see FEC v. Colorado Republican Federal Campaign Comm.*, 59 F.3d 1015, 1021 (10th Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 689, 133 L.Ed.2d 594 (1996).

On its own terms, the Commission's plea for a broadening of the *Buckley* concept cannot prevail under the existing authority applicable to the facts of this case. First, the terms "partisan electoral politics" and "electioneering" raise virtually the same vagueness concerns as the language "influencing any election for Federal office," the raw application of which the *Buckley* Court determined would impermissibly impinge on First Amendment values. *See Buckley*, 424 U.S. at 79, 96 S.Ct. at 663. The Commission would interpret the Act and *Buckley* as drawing a definitive line between issue advocacy groups and "partisan electoral politics" groups. *See* Pl.'s Mot. at 10; Pl.'s Opp'n at 3. The *Buckley* Court observed, however, that

> the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and government actions. Not only do candidates campaign on the basis of their positions on various issues, but campaigns themselves generate issues of public interest.

424 U.S. at 42, 96 S.Ct. at 646.

Second, our Court of Appeals has cautioned that in this "delicate first amendment area, there is no imperative to stretch the statutory language.... Achieving a reasonable, constitutionally sound conclusion in this case requires just the opposite. 'It is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality.'" *Machinists*, 655 F.2d at 394 (citation omitted). The Commission contends that the major purpose test, as applied here, creates a loophole in which "partisan political groups ... could hide their contributors' identities and their

partisan electoral activities by artfully avoiding naming a particular federal candidate." Pl.'s Mot. at 2. Indeed, there is evidence that one Charter Member accompanied a $10,000 contribution with a request for an appointment with Congressman Gingrich in his capacity as GOPAC General Chairman, to discuss asbestos regulations of concern to the Charter Member. *See* Pl.'s Ex. 66 at 4854–55. And in that capacity, Chairman Gingrich indicated that he "will look into it." Pl.'s Ex. 66 at 4858. Another Charter Member accompanied his $10,000 contribution with a thank you note to Congressman Barton for his assistance in the Charter Member's "dumping case against Mexican cement producers." *See* Pl.'s Ex. 66 at 4807. However, there is no showing that either Congressman was a candidate for election in either late 1989 or January 1990. *See Machinists*, 655 F.2d at 392. As counsel for GOPAC correctly observed, this "may be an ethics issue," but the contributions were not "support for a particular [federal] candidate.... [I]t's not a candidate thing." Tr. at 61–62.

Third, in this sensitive political area where core First Amendment values are at stake, our Court of Appeals has shown a strong preference for "bright-line" rules that are easily understood and followed by those subject to them—contributors, recipients, and organizations. As the Court of Appeals has explained, "an objective test is required to coordinate the liabilities of donors and donees. The bright-line test is also necessary to enable donees and donors to easily conform to the law and to enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena." *Orloski v. FEC*, 795 F.2d 156, 165 (D.C.Cir.1986). Confining the definition of "political committee" to an organization whose major purpose is the election of a particular federal candidate or candidates provides an appropriate "bright-line" rule; attempting to determine what is an "issue advocacy" group versus an "electoral politics" group—as the Commission proposes—does not. *See Buckley*, 424 U.S. at 42, 96 S.Ct. at 646. As a matter of law, the Commission has failed to demonstrate that GOPAC became a "political committee" within the meaning of

the Act by spending or receiving $1,000 or more and engaging in "partisan politics" and "electioneering."

### B.

▉ Accordingly, the legal standard set forth in the December 23, 1994 Memorandum and Order controls this case: an organization is a "political committee" under the Act if it received and/or expended $1,000 or more and had as its major purpose the election of a particular candidate or candidates for federal office. This test draws two relatively clear lines: first, the line between state and federal candidates, derived from the plain language of the Act and traditional principles of federalism, *see* 2 U.S.C. §§ 431(4)(A), 431(8)(A)(i), 431(9)(A)(i); and second, the line between an organization whose major purpose was to support a particular federal candidate or candidates and an organization whose major purpose did not involve support for any particular federal candidate, either because there was no candidate running at the time, *see Machinists*, 655 F.2d at 392, or because the support was not directed to the election of any particular candidate but was more in the nature of general party support.

The matter is at issue here on cross-motions for summary judgment, so that each party is a moving party. Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Further, the burden on the moving party, who does not bear the burden of proof at trial, "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. Here, the Commission concedes that GOPAC provided no direct support to any particular federal candidate in 1989 and 1990. *See* Pl.'s Opp'n at 4. Furthermore, GOPAC has shown that the Commission has proffered insufficient competent, material evidence of indirect support for such candidates to satisfy the *Buckley* major purpose test.

### 1.

▉ The Commission alleges that in 1989 and 1990, GOPAC directly supported the election or defeat of three particular candidates for federal office: Congressman Gingrich, Vice President Bush, and Speaker Wright. *See* Pl.'s Mot. at 26, 44–49. Specifically, the Commission alleges that the "think tank" support staff which GOPAC provided for Congressman Gingrich in his capacity as GOPAC General Chairman—referred to within the organization as "Newt support"—aided his reelection campaign in 1990. *Id.* at 46–47. At oral argument, in response to a question whether there was any evidence that funds for "Newt support" in 1989 and 1990 "spilled over into [Congressman Gingrich's] election campaign," Commission counsel answered, "We have statements by people who would know." The only statements proffered by the Commission on this point, however, are an audiotape and transcript of a conversation or meeting among unidentified persons. Such a transcript—identified as "male voice" and "female voice"—probably does not constitute "significantly probative," material evidence upon which a trier of fact could decide for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In any event, the statements do not constitute sufficient evidence or support reasonable inferences therefrom that funds for "Newt support" "spilled over" into Congressman Gingrich's election campaign.[2] *See* Pl.'s

---

**2.** In the transcript of a discussion of "Newt support," a female voice states, among other things, "If Newt decides he's got a Saturday free in Georgia, he wants people a[ ]round him. And GOPAC pays those bills. I mean we pay for them to fly down there." A female voice also states that, "I absolutely agree that [Newt] needs ['Newt support.'] Because I have always said—

(inaudible)—political candidates don't do anything until you talk to somebody else about it. Because you can get blind-sided—(inaudible). You can get blind-sided and do something that has a consequence that you hadn't thought of." *See* Pl.'s Ex. 36 at 49–50. It is possible to infer from this that some GOPAC services "spilled over" into Congressman Gingrich's campaign.

Ex. 36 ("An Interview with GOPAC Charter Members," Aug. 6, 1990 Tr.); Pl.'s Ex. 71 (audiotape of "An Interview with GOPAC Charter Members," Aug. 6, 1990); Pl.'s Ex. 5 at 2 (Decl. of James L. Jones, Commission Management Assistant) (stating that plaintiffs' exhibits are accurate copies of GOPAC-produced tapes); Pl.'s Statement ¶¶ 214–16. Most important, at oral argument, Commission counsel further recognized that the Commission "submitted [evidence of 'Newt support'] not to prove that a contribution was made to then Congressman Gingrich's campaign committee, but to demonstrate that GOPAC's purpose was electoral politics.... [A]n investigation would be necessary before anyone could conclude that an actual contribution was made, and that has not been done." Tr. at 24. Commission counsel further stated that "I haven't made that contention [that GOPAC made a contribution to Congressman Gingrich's campaign committee]. It's not necessary in this case." Tr. at 24.[3]

Regarding Vice President Bush, the Commission alleges that GOPAC proposed and widely circulated a letter dated August 12, 1988, specifically supporting his candidacy for President. However, the complaint alleges that GOPAC became a "political committee" in 1989. Accordingly, this letter is not material. Finally, in a "Campaign for Fair Elections" letter, dated May 30, 1989, Congressman Gingrich described Speaker Wright as a "corrupt Democrat" and stated that Speaker Wright and his fellow Democratic Congressmen have "entrenched themselves into a permanent majority in Congress. It's now practically impossible to defeat a sitting member of the House." Pl.'s Ex. 30 at 2709 (Letter from Congressman Gingrich to Mr. Reinaldo Lozano). Although Speaker Wright is mentioned by name, the letter does not advocate his election or defeat, nor was it directed at Speaker Wright's constituents. (For example, Mr. Lozano is from Miami, Florida; Speaker Wright is from Texas.) Instead, the letter attacks generally the Democratic Congress, of which Speaker Wright was a prominent member, and the franking privilege, which arguably facilitated Democratic control of Congress, and requests contributions to "help [GOPAC] stay on track with our ongoing programs for state candidates ... as well as undertake our new Campaign

---

However, this Circuit's preference for bright line rules in defining "political committee" counsels against reliance on any such inferences. While a genuine issue of material fact might be created from some inferences, Commission counsel's statement that the Commission "submitted [evidence of 'Newt support'] not to prove that a contribution was made to then Congressman Gingrich's campaign committee but to demonstrate that GOPAC's purpose was electoral politics" precludes reliance on any such inferences. Tr. at 24. Not every inference is reasonable. *See, e.g., Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.*, 877 F.2d 1010, 1015 (D.C.Cir.1989) (affirming district court's grant of summary judgment where no reasonable inference could be made in non-movant's favor as a matter of law).

3. The transcript of the full exchange reads as follows:

The Court: You make an argument at some point that funds in 1989 and 1990 to provide staff for Chairman Gingrich was—that a part of it spilled over into his election campaign. Do you have any evidence of that?

Mr. Hershkowitz [Commission counsel]: We have statements by people who would know.

The Court: You have a statement by an unnamed person. That female voice is the only thing I saw. Is that the only item of evidence that you have?

Mr. Hershkowitz: If the Court listens to the tapes, I think the Court would agree that that female voice was the Executive Director of GOPAC, Kay Riddle. The people at that meeting—and we have submitted a list of people at that meeting—were GOPAC senior staff, which is Bo Calloway [sic], Kay Riddle, it's [sic] finance director, and the largest contributors who were on the finance committee, who were involved in approving the budget, the direction, the projects that GOPAC was spending its money on, and that these people were in a position to know where GOPAC's funds were spent. We submitted that not to prove that a contribution was made to then Congressman Gingrich's campaign committee, but to demonstrate that GOPAC's purpose was electoral politics. There are a lot of issues that would have to be resolved and an investigation would be necessary before anyone could conclude that an actual contribution was made, and that has not been done.

The Court: And you haven't made that contention.

Mr. Hershkowitz: I haven't made that contention. It's not necessary in this case.

Tr. at 23–24.

for Fair Elections project." *Id.* at 2711. GOPAC has shown that the Commission has not supported any of these allegations with proffers of probative, material, undisputed facts and thus, GOPAC, rather than the Commission, is entitled to a summary judgment with respect to the 1989 and 1990 elections of President Bush and Congressman Gingrich and the removal of Speaker Wright from the House of Representatives by the House itself rather than the electorate.

2.

■ In addition to the foregoing examples advanced by the Commission of GOPAC support for particular candidates, the Commission sought to demonstrate a major GOPAC purpose to influence federal elections indirectly. It is arguable that GOPAC's concentration of support for Republican candidates for state legislatures where reapportionment was likely to advantage Republican candidates for federal office was sufficiently direct support for particular candidates to require its registration. The parties' response to a January 29, 1996 Notice to Counsel identified the Republican candidates for Congress from each state where GOPAC anticipated reapportionment favorable to Republicans. However, unchallenged advisory opinions of the Commission treat the apportionment process as "separate and distinct from the election process by which individuals are selected for office." *See* Pl.'s Second Notice of Filing, Feb. 14, 1996 (Advisory Opinion 1981–35). Thus, although the candidates who benefited indirectly were identifiable after the fact, GOPAC's support for legislators who would be likely to cause reapportionment advantageous to a federal candidate does not constitute support for the election or defeat of a particular candidate for federal office.

■ Nor does GOPAC's support for a "farm team" of future candidates for federal office constitute support for an actual, particular federal candidate or candidates. *See Machinists,* 655 F.2d at 392. It is undisputed that once a farm team member decided to run for Congress and requested contributions from GOPAC, "he or she was referred to the [National Republican Campaign Committee]." Def.'s Statement ¶ 53; Pl.'s Response ¶ 53.

■ At oral argument, Commission counsel generally observed that "[t]he Commission has taken the position in the past—and takes the position today—that providing a forum for candidates to appear and solicit contributions is a contribution itself to the candidates." Tr. at 20. However, the Commission has not pointed to evidence that would sustain a claim that GOPAC served as such a forum. The Commission cites a statement in a *New Yorker* magazine article that "GOPAC served as a fundraising mechanism for congressional candidates" during the 1990 election cycle. Pl.'s Statement ¶ 203. *But see* Def.'s Response ¶ 203. However, accounts of GOPAC meetings attended by national leaders, possibly including members of Congress, and Charter Members conspicuously fail to establish that GOPAC used the meetings as forums for candidates to solicit contributions. *See* Pl.'s Statement ¶¶ 54–56, 64–71, 76–87; *compare* Tr. at 20. Moreover, a magazine article is not "significantly probative" nor is it "material" "evidence on which [a trier of fact] could reasonably find" that GOPAC served as a "fundraising" mechanism for federal candidates. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 252, 106 S.Ct. 2505, 2510–11, 2512, 91 L.Ed.2d 202 (1986); *see also Doe v. Gates,* 981 F.2d 1316, 1323 (D.C.Cir.), *cert. denied sub nom. Doe v. Woolsey,* — U.S. —, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993).[4] The Commission

---

**4.** Even if the statements in the *New Yorker* article were proven, they would not sustain a claim that GOPAC furnished support to any particular federal candidates. For example, that article states that "Representative John Linder, a Georgia Republican, told me that GOPAC had funded the computers and the software for the redistricting." Connie Bruck, *The Politics of Perception,* New Yorker, Oct. 9, 1995, at 61. Assuming this constitutes direct support for redistricting, how-

ever, the Commission stated in oral argument that "[only] if the organization makes expenditures for such things as computer equipment, and then that computer equipment is used in someone's election, [does] that computer equipment then become[] an expenditure in connection with that election." Tr. at 23. The article also states that "[a] former GOPAC member, Thomas L. (Dusty) Rhodes, ... told me that back in 1990—before GOPAC was acknowledging any

points to the fact that Congressman Gingrich's Campaign Committee received $124,503 or 23% of the $539,328 contributed to Republican candidates for the House of Representatives in 1990 by Charter Members. However, the Commission does not allege or proffer direct evidence that there is any causal connection between GOPAC's actions and Congressman Gingrich's disproportionate share of such contributions. In other circumstances where no First Amendment values are at stake, a trier of fact might be required to weigh possible inferences from this concentration of contributions. However, in this area where objective bright lines are in order, a finding that GOPAC served as a fundraising forum based on such inferences would require more subjective judgments than are appropriate, particularly where, as here, the Charter Member contributors and/or the campaign obviously reported the $124,503 in contributions to the Commission pursuant to their obligations under other provisions of the Act.[5]

It is undisputed that in 1990, in response to an inquiry from a Charter Member, GOPAC identified four congressional campaigns which it considered to be the most important, and the Charter Member subsequently contributed $1,500 to three of these. *See supra* at 855. However, the Commission has not treated an organization's response to a contributor's request for advice about where to place a contribution as a contribution itself. Tr. at 20. It correctly distinguishes such communication from an organization's provision of a forum for the solicitation for contributions, which provision the Commission does treat as a contribution. *Id.*[6]

GOPAC concedes that in 1989 and 1990, in pursuit of its objective to elect a Republican majority in the House of Representatives, it provided direct financial support to state and local candidates and widely distributed services and other things of value, such as audiotapes and videotapes, to others, possibly including Republican candidates for Congress. For example, GOPAC anticipated that some of its expenditures directly for the benefit of Republican state and local candidates in Michigan, Montana, and Texas could have the effect of "reverse coat tails"—that is, strengthening the entire Republican ticket

---

federal activity at all—candidates would come to GOPAC meetings, and GOPAC members would often send money directly to the candidates as individual contributions." *Id.* at 66. However, there is no evidence that GOPAC participated in any solicitation of contributions or that it arranged these meetings to facilitate contributions. *See supra* at 864–65 & n. 6.

5. After Congressman Gingrich, Congressman Barton was the second largest beneficiary of GOPAC Charter Members' contributions to congressional election campaigns. *See* Pl.'s Ex. 10. There is a statement in the record, from a "female voice" in the "Interview with GOPAC Charter Members," that "Joe Barton wants every penny that he's raised back in Texas." Pl.'s Ex. 36 at 52. However, this evidence is not "significantly probative" of a direct contribution by GOPAC to a particular federal candidate; there is no evidence that GOPAC accommodated Congressman Barton's alleged wish for "every penny that he's raised back in Texas"; and the Commission does not allege that Congressman Barton directly benefited from money he raised for GOPAC.

6. As Commission counsel stated in an exchange with the Court:

The Court: With respect to charter members, there is some evidence that GOPAC at least advised at least one charter member who had asked for advice, pointed him to—I think it was four congressional candidates.

Mr. Hershkowitz: The so-called "silver bullets."

The Court: Where does that fit into this—First of all, do you consider that an undisputed fact?

Mr. Hershkowitz: We consider it an undisputed fact. We have provided the Court with the so-called "silver bullets memo" asking for that information, and we have also submitted to the Court evidence that contributions were then made to two of those people who were on the list by the person who, according to the memo, was asked for that information. The Commission has taken the position in the past—and takes the position today—that providing a forum for candidates to appear and solicit contributions is a contribution itself to candidates. I don't know of any decision of the Commission that relates specifically to a situation where someone has asked "who do you think I should contribute to", and they do, and then that would be a contribution. The opposite is true. If somebody asked me who to contribute to and I said, "Oh, I think so and so is a good candidate", that doesn't mean that I'm making a contribution to that candidate by telling someone who I think is a good candidate.

Tr. at 19–20.

866

in the jurisdiction, including federal candidates. *See* Pl.'s Ex. 66 at 3785 (Michigan); Pl.'s Ex. 66 at 3945 (Montana); Pl.'s Ex. 66 at 5519 (Texas); *supra* at 857. GOPAC trained its state and local candidates on issues of national scope and importance so that "all of the campaigns [would] be able to subsume themselves into a larger pattern so that ... you create an echo effect, a resonance, which fits about 88 percent of the country." Pl.'s Ex. 23 at 38 (Gingrich Dep.). GOPAC furnished literature, tapes, and services to Republicans generally, including, incidentally, Republican candidates for federal office. GOPAC also planned "to assist the national Party committees in educating the voters in 'swing' Congressional districts about their Democratic Congressmen's voting records." Pl.'s Statement ¶ 270; Pl.'s Ex. 30 at 2727B (GOPAC 1989–1990 Political Strategy Campaign Plan and Budget).

 As Commission counsel acknowledged in oral argument with respect to possible indirect support for Congressman Gingrich's 1990 campaign, it would be theoretically possible to isolate and trace the indirect impact on congressional elections of GOPAC contributions to other local and state candidates and of its more generalized activities nationwide in an attempt to show a causal connection between the contributions and activities and the election of a particular federal candidate or candidates. However, the Commission has "never opined on that particular question [whether indirect support is relevant]." Tr. at 17. Nor has either counsel cited, nor has independent research discovered, any other authority on the subject. In the circumstances here, the best guidance is our Court of Appeals' observation that: "In this delicate first amendment area, there is no imperative to stretch the statutory language.... Achieving a reasonable, constitutionally sound conclusion in this case requires just the opposite." *Machinists*, 655 F.2d at 394. The foregoing examples of arguably indirect support more nearly resemble general party and pre-candidacy support, which the relevant precedents distinguish from support for any particular federal candidate or candidates.

Furthermore, it is apparent from the Commission's strong pleas to adopt its broader concept of the Act as applied to political committees, and from its stance at oral argument, that it would prefer not to undertake, or impose on the regulated, the burden of trying to detect a quantifiable, or causal, connection between support directed to state and local candidates, or expenditures for party support without reference to a particular candidate, and any indirect benefit to a federal candidate. In any event, it has conspicuously failed to do so. *See* Tr. at 24; *supra* at 862–63. Direct support can be readily detected and quantified by conventional inquiry and accounting techniques; indirect support cannot. *Cf. Robertson*, 45 F.3d at 486. Indeed, the Commission has allocation rules according to which an organization separates its federal expenditures and activities from its non-federal ones and reports only the former. *See* Tr. at 51–52, 63; *see also Robertson*, 45 F.3d at 491. There do not appear to be any allocation rules for distinguishing between direct and indirect support. During several months of unlimited discovery, the Commission collected data for 315 items consuming 100 pages of material facts not in dispute based on 6,000 pages of exhibits without firmly establishing its claim based on the *Buckley* major purpose test. Our Court of Appeals' observation merits repetition: "[a] bright-line test is ... necessary to enable donees and donors to easily conform their conduct to the law and to enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena." *Orloski*, 795 F.2d at 165. This authoritative and reasonable preference for bright-line rules counsels persuasively against making GOPAC's obligation to register as a political committee as of 1989 and 1990 turn on a 1996 fact-trier's evaluation of circumstantial evidence and inferences therefrom as to whether GOPAC's in-house support for Newt Gingrich as its General Chairman, its direct support for state and local candidates, and its more generalized activities nationwide indirectly benefited a particular *federal* candidate or candidates. For all of the foregoing reasons, an accompanying Order denies the Commission's motion for

summary judgment and grants GOPAC's motion for summary judgment.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 28th day of February, 1996 hereby

ORDERED: that the Commission's motion for summary judgment should be, and is hereby, DENIED; and it is further

ORDERED: that GOPAC's motion for summary judgment should be, and is hereby, GRANTED.